Julian E. Ross and Gertrude A. Ross v. Commissioner.
Ross v. Commissioner
Docket No. 40441.
United States Tax Court
T.C. Memo 1954-177; 1954 Tax Ct. Memo LEXIS 72; 13 T.C.M. (CCH) 974; T.C.M. (RIA) 54283; October 18, 1954, Filed *72 Robert C. Claiborne, Esq., Julian E. Ross, Esq., pro se, and Julian L. Williams, Esq., 608 Sweet Building, Fort Lauderdale, Fla., for the petitioners. Alben E. Carpens, Esq., and Newman A. Townsend, Jr., Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion Respondent determined a deficiency in petitioners' income taxes for 1948 and 1949 in the respective amounts of $1,214.58 and $4,703.90. The issues presented are (1) whether for the taxable years involved the gains realized by petitioners from the sales of certain real estate constituted ordinary income, and (2) whether the respondent erred in disallowing part of the medical expense deduction claimed by petitioners for the taxable year 1949. For the taxable year 1948 petitioners claim an overpayment in the amount of $400.52. Findings of Fact The facts which are stipulated are found accordingly. In addition, the parties have stipulated that the testimony of L. C. Judd and petitioner Julian E. Ross in a companion proceeding, Ralph A. Horton and Louisa L. Horton, Docket No. 40364, [13 TCM 899, T.C. Memo. 1954-161], shall be considered as part of the record in the instant proceeding. *73 Petitioners, husband and wife, are residents of Fort Lauderdale, Florida. Their joint income tax returns for 1948 and 1949 were filed with the collector of internal revenue for the district of Florida, at Jacksonville. Julian E. Ross has been actively engaged since 1926 as an attorney at law in Fort Lauderdale, Florida, specializing in the field of real estate. Gertrude A. Ross is a housewife and has not engaged in business other than in name only. From March 10, 1943, through May 1, 1945, Julian E. Ross was a member of the partnership, Ross, Horton, Hixson, Rickard and Hyde, holding a 50 percent interest therein. Ralph A. Horton and his wife, Louisa L. Horton, hereinafter referred to as the Hortons, held a 35 percent interest, and Hixson, Rikhard and Hyde each held a 5 percent interest. The partnership, Ross, Horton, Hixson, Rickard and Hyde, sometimes hereinafter referred to as the Tanger Trust, was formed in order to bid at the foreclosure sale on property located in and around Fort Lauderdale. On March 4, 1943, title to the foreclosed property, consisting of 166 lots, was acquired by the Tanger Investment Company, a use corporation, in trust for the use and benefit of *74 the Tanger Trust which had submitted the only bid at the foreclosure sale in the amount of $2,305. On May 1, 1945, the Tanger Trust was terminated. The total reported sales of real estate during its existence were as follows: Lots
Lots
Trans-
Cost
Year
acquired
sold
actions
basis
Sales price
Total gain
1943
166
37 plus
21
$ 4,905.20
$10,632.73
$ 5,727.53
1944
4
58 1/2
24
6,372.95
24,338.39
17,965.44
1945
1
29
8
5,081.65
21,348.44
16,266.79
171
124 1/2 plus
53
$16,359.80
$56,319.56
$39,959.76
The Tanger Trust maintained no office of its own, the majority of closings being made in the office of the partner, Julian E. Ross, who usually prepared the deed. All records were maintained there during the entire period of the existence of the Tanger Trust. Although the Tanger Trust did no advertising, listing, or subdividing with respect to its assets, including subsequently acquired lots as well as the original 166, its sales activities were frequent and substantial due to the fact that the market for real estate in and around Fort Lauderdale at the time was such that persons interested in purchasing sought out the *75 property owners. Of the 50 percent interest held by Julian E. Ross in May 1945, when the Tanger Trust terminated, 15 percent was received by him in actual distribution and the remaining 35 percent of his interest was allowed to remain in the Tanger Investment Company. The Hortons, who held a 35 percent interest, allowed their interest to remain in the name of Tanger Investment Company. The other partners received distribution of their interests. From 1944 until the final distribution in liquidation in 1949, Julian E. Ross held a one-half interest with the Hortons in a partnership known as Ross and Horton. This partnership, sometimes hereinafter referred to as the Flova Trust, was created in February 1944 under a declaration of trust whereby title to all partnership property was to be held in the name of the Tanger Investment Company, a use corporation. In May 1945 Julian E. Ross and the Hortons each transferred the property constituting their respective interests from the Tanger Trust to the Flova Trust, title remaining in the name of the Tanger Investment Company. Most of the property held by the Flova Trust consisted of title to many unsold lots located in a subdivision known *76 as Progresso. The Hortons had purchased the lots during the years 1915 to 1926, but, during the depression years following, they had allowed the tax payments to lapse on many of the lots. Julian E. Ross put up cash to match the equity of the Hortons. The activities of the Flova Trust thereafter consisted of paying up back taxes to redeem the Progresso lots for the joint account of the partners. In addition, the partnership bought and sold other real estate. The partnership returns for the Flova Trust for the years 1944 to 1948, inclusive, show the following real estate transactions: Trans-
Cost basis
Year
Lots acquired
Lots sold
actions
of lots
Sales
Total gain
sold
price
1944
Unknown
37 1/2 plus
13
$ 1,806.19
$ 4,642.71
$ 2,836.52
1945
Unknown
76
38
14,044.38
32,985.49
18,941.11
1946
Unknown
278 1/2
35
13,716.35
98,351.10
84,634.75
1947
Unknown
33
22
5,476.90
32,827.78
21,238.18
1948
Unknown
2
2
899.19
3,602.50
2,093.46
The partnership, Ross and Horton, maintained no office of its own. Sales of real estate were made by purchasers contacting either Ralph A. Horton or his partner, petitioner *77 Julian E. Ross, who kept the partnership records and prepared the final closings. In February 1948, with the exception of three parcels of land, the Flova Trust partnership distributed its assets equally between Julian E. Ross and the Hortons. The partnership was finally liquidated as to the three parcels in 1949. During each of the taxable years 1948 and 1949 the real estate sold by the partnership, Ross and Horton, otherwise known as the Flova Trust, was property held primarily for sale to customers in the ordinary course of the partnership's real estate business. From 1944 to February 1948 petitioners held a one-fourth interest in the partnership, Horton, Hyde, Hixson, Rickard and Ross, sometimes hereinafter referred to as the Devon Trust partnership. This partnership was formed to acquire a large undeveloped tract of land consisting of 651 lots in a remote section of Fort Lauderdale. During the period the partnership was in existence no part of the large tract was ever sold, subdivided or improved, but remained in its original condition until 1948, when it was sold for $18,000 to the Milford Corporation, a corporation engaged in the real estate business. Petitioners held *78 25 percent of the stock of Milford Corporation, the remaining shares being held by the same persons in approximately the same proportionate interests as previously held in the Devon Trust partnership. Other lands not included in the large tract were acquired by the Devon Trust in 1944 and 1945 and sold during the years 1946 through 1948, as follows: Year
Lots
Lots sold
Transactions
Cost basis
Sales price
Total gain
acquired
1946
Unknown
28
11
$4,447.17
$13,665.20
$ 9,218.03
1947
Unknown
Unknown
Unknown
3,195.99
19,817.50
12,912.35
1948
Unknown
1
1
89.20
977.34
888.14
The Devon Trust had no office of its own and selling was done by purchasers contacting either Julian E. Ross or Rickard or Hixson. The real estate sold by the partnership, Horton, Hyde, Hixson, Rickard and Ross, otherwise known as the Devon Trust, during the taxable years 1948 was property held primarily for sale to customers in the ordinary course of the partnership's real estate business. In 1939 petitioners began investing their funds in colored housing units. During the years 1939 to 1941, inclusive, petitioner purchased eleven 25 foot lots in North *79 Lauderdale, an area lying within one-half mile of the center of Fort Lauderdale. Although it was not possible to build on any one single lot, petitioners constructed several negro rental units on certain adjoining lots. During 1944 and 1945 petitioners purchased a vast number of 25 foot lots in available negro subdivisions, known as Durr's Subdivision, Liberty Park, and others. These areas were located some two to three miles from Fort Lauderdale and were situated in close proximity to the city incinerator and garbage disposal plant. Petitioners never built any rental units on these low-priced lots. During 1945 and 1946 petitioners purchased approximately 200 lots in a 15-block area in the Progresso Subdivision of Fort Lauderdale. Petitioners did not start building any rental units in this area until 1949. Only 18 of these lots were ever used for the construction of rental units. During the years 1944 to 1949, inclusive, the petitioners made the following real estate transactions: Cost basis
Year
Lots
Lots sold
Transactions
of lots
Sales price
Gain
acquired
sold
1944
59
Unknown
Unknown
$ 212.75
$ 234.37
$ 21.62
1945
97
20 plus
Unknown
4,904.68
10,134.39
5,229.71
1946
Unknown
2 plus
Unknown
2,396.65
7,102.69
4,706.04
1947
3
4 plus
Unknown
2,380.70
9,244.20
6,863.50
1948
Unknown
37 plus
25
1,561.91
12,012.96
10,451.05
1949
126 1/2
198 plus
15
9,890.90
29,268.13
20,377.23
plus
285 1/2
261 plus
40 plus
$21,347.59
$67,996.74
$47,649.15
plus
undeter-
underter-
undeter
mined
mined
mined
number
number
number
of others
of others
of others
*80 During the years 1944 to 1949, inclusive, petitioners derived their income as follows: Line 1 - Sale real estate, petitioners individually. Line 2 - Income to petitioners, sale real estate, Flova Trust. Line 3 - Income to petitioners, sale real estate, Tanger Trust. Line 4 - Income to petitioners, sale real estate, Devon Trust. Line 5 - Total income from law practice. Line 6 - Income from rent. 1944
1945
1946
1947
1948
1949
1
$ 21.62
$ 4,982.48
$ 4,893.88
$ 6,799.14
$10,047.77
$14,972.08
2
1,418.26
9,470.55
37,577.33
12,082.05
1,046.74
4,873.14
3
8,982.72
8,133.39
4
2,304.49
3,228.08
222.04
5
10,996.76
11,411.27
20,590.27
21,788.44
8,536.93
18,453.78
6
4,425.96
4,643.75
5,395.88
3,033.29
5,857.09
5,152.95
The individual and joint real estate transactions of the petitioners constituted a separate and distinct business apart from the law practice of Julian E. Ross. During each of the taxable years 1948 and 1949 the petitioners were engaged in the real estate business. The real estate sold by them during the years in question was held primarily for sale to customers in the ordinary course of *81 business. In determining his deficiency for the taxable year 1948 the respondent increased the income of the petitioners by treating the gain from certain sales of real property made by the petitioners individually and by the partnerships of which they were members as ordinary income, whereas, on their joint return the realized profit was reported as long-term capital gain. In determining his deficiency for the taxable year 1949 the respondent likewise increased the income of the petitioners by treating the gain from the sales of certain real estate as ordinary income, whereas, the petitioners on their joint return had reported the profit as long-term capital gain. Also, on their 1949 return the petitioners claimed a medical deduction of $637.74. Because of the increase in petitioners' income for 1949 the respondent adjusted the medical deduction to $146.28, thereby disallowing $491.46 of the claimed deduction. The above adjustments constitute the only matters in controversy. Opinion LEMIRE, Judge: The principal question presented is whether the gains realized by the petitioners in the taxable years 1948 and 1949 from the sales of real property are taxable as ordinary income *82 or as profits from the sale of capital assets. Respondent has determined that the sales in question involved properties held primarily for sale to customers in the ordinary course of business. Petitioners, on the other hand, contend that they were not in the real estate business, but acquired and held the properties for investment purposes. The question is factual and is to be determined from a consideration of all the pertinent facts and circumstances. Higgins v. Commissioner, 312 U.S. 212; Mauldin v. Commissioner, 195 Fed. (2d) 714; King v. Commissioner, 189 Fed. (2d) 122, certiorari denied, 342 U.S. 829; South Texas Properties Co., 16 T.C. 1003. Among the factors usually applied in determining whether property is held primarily for sale to customers in the ordinary course of the trade or business are the purpose for which the property was acquired, the purpose for which it was held at the time of sale, the continuity, frequency, and substantiality of the transactions involved, and the sales activity in relation thereto. The record shows that during the years 1943 to 1948 petitioners were members of several partnerships, *83 each of which we have found was actively engaged in the real estate business. The record further establishes that during each of the taxable years 1948 and 1949 petitioners purchased and sold considerable amounts of real estate. In addition to the volume of sales, the frequency, substantiality, and continuity of the sales clearly demonstrate that the lots in question, which were located in several areas adjacent to the city incinerator of Fort Lauderdale, were held by petitioners primarily for resale in the ordinary course of their business and were not held for investment purposes. In so holding we have given due consideration to the fact that during the years 1948 and 1949 petitioners maintained several rental housing units on lots located in North Lauderdale and the Progresso Subdivision of Fort Lauderdale. Since none of the lots so used were sold by petitioners in the taxable years involved, we are not here concerned with them except that we think such fact indicates the cheaper "incinerator" lots were held for business resale purposes. We hold, therefore, that the sales of real estate made by the petitioners in the respective taxable years in question were properties held *84 by the petitioners primarily for sale to customers in the ordinary course of their real estate business. [1] The gains realized from such sales constitute ordinary income and not long-term capital gains. The second question presented is whether the respondent properly disallowed the amount of $491.46 as a medical deduction in the taxable year 1949. In their return for that year petitioners reported total medical expenses of $2,365.63 and claimed a deduction of $637.74, based upon an adjusted gross income of $34,557.86. Since the respondent increased the adjusted gross income to $44,386.97 the maximum allowable medical deduction under section 23(x) of the Internal Revenue Code of 1939 is automatically reduced to the amount of $146.28. Therefore, the respondent properly reduced the claimed deduction to the latter amount. The respondent's determination of a deficiency for each of the taxable years 1948 and 1949 is sustained. Decision will be entered for the respondent. Footnotes
1. Cf. companion case, Ralph A. Horton and Louisa L. Horton, Docket No. 40364 (memorandum opinion, Sept. 28, 1954) [13 TCM 899, T.C. Memo. 1954-161↩].